**UNITED STATES of America, Plaintiff–Appellant,**

v.

**John M. BROWN, Defendant–Appellee.**

**No. 90–2066.**

United States Court of Appeals, Tenth Circuit.

Feb. 21, 1991.

1302

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Paula G. Burnett, Asst. U.S. Atty., Albuquerque, N.M., on the brief), for plaintiff-appellant.

Paul J. Kennedy, Albuquerque, N.M., for defendant-appellee.

Before HOLLOWAY, Chief Judge, EBEL, Circuit Judge, and NOTTINGHAM *, District Judge.

HOLLOWAY, Chief Judge.

The United States appeals from a dismissal by the district court of an indictment charging the defendant, John M. Brown, with three counts of violations of the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315.[1] The indictment was dismissed on the ground that the allegedly stolen property, a computer program in source code form, did not come within the ambit of 18 U.S.C. §§ 2314 and 2315 as goods, wares or merchandise. We affirm.

I

At the hearing on the motion to dismiss the indictment, government counsel stated that defendant Brown worked as a computer programmer for The Software Link, Inc. (hereinafter TSL), a computer software company located in Georgia (II R. 31). One asset of TSL was a computer program known as PC–MOS/386.[2] Later in New Mexico, Brown was the subject of an FBI investigation which culminated in the issuance and execution of a search warrant for his apartment. During the search of Brown's residence, the FBI discovered five

---

* Honorable Edward W. Nottingham, United States District Judge for the District of Colorado, sitting by designation.

1. Section 2314 applies, in part, to whoever "transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314.

 Section 2315 applies, in part, to whoever "receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken." 18 U.S.C. § 2315.

2. PC–MOS/386 allows certain International Business Machines (IBM) compatible computers to perform complex activities such as multitasking and sharing of data among multiple users. II R. at 45–46.

three-ring notebooks and a hard disk[3] which contained portions of the source code[4] for the PC–MOS/386 program. II R. at 47.

A grand jury returned a three count indictment on November 16, 1989, charging Brown in one count with violating 18 U.S.C. § 2314 and in two counts with violating 18 U.S.C. § 2315.[5] At a pretrial motion hearing, the district judge granted a motion to dismiss made by the defendant.[6] The judge based his decision primarily on *Dowling v. United States*, 473 U.S. 207, 216, 226, 105 S.Ct. 3127, 3132, 3137, 87 L.Ed.2d 152 (1985), which held that § 2314 does not apply to crimes which involve mere copyright infringement and emphasized the fact that cases under § 2314 have always involved "physical 'goods, wares [or] merchandise'" that have themselves been "stolen, converted or taken by fraud."

## II

The procedural handling of the case below is questioned. In the pretrial stage of the proceedings, Brown filed a motion to dismiss. The motion alleged that upon his termination from TSL, the company shipped his materials from Georgia to his home in New Mexico; that these included his backup tapes, owned by him; that when packaged, the source code, PC–MOS/386, was on the tapes; that material from the government provided to defendant indicates the source code is copyright material belonging to TSL. The motion concluded that the source code was "intellectual property" and that the infringement the government alleges implicates complex copyright interests, and that this intellectual property cannot constitute goods, wares or merchandise under the National Stolen Property Act. For reasons that might appear at a full hearing, defendant asked that his motion to dismiss be granted.

In ruling on the motion the trial judge did not consider solely the face of the indictment in determining its sufficiency, but instead conducted an evidentiary hearing. The court suggested having a factual predicate established to show what happened physically in this case; neither the government nor the defendant objected to that procedure. II R. 39–40.[7] Three witnesses were allowed to testify at this hearing and

---

**3.** A hard disk drive is one of the primary types of media for storing and retrieving computer data. They are characterized by a fast access time and a fixed storage capacity.

**4.** Programmers often write programs in source code, also called assembly language. This type of code contains mnemonic abbreviations for each step and can be read by expert programmers. Once a programmer has access to the source code of a program, he is able to determine the construction of the program and write his own version. For this reason, source code programs are typically compiled (translated) into and sold as object code or machine language, which is not discernable to even an expert programmer, but which is readily usable by the computer.

**5.** Count I stated that Brown "did knowingly cause to be transported in interstate commerce from Norcross, in the State of Georgia, to Albuquerque, New Mexico, computer programs, software and manuals, to wit: a computer program with source code PC–MOS/386 an exclusive product of The Software Link, Inc., (TSL), such items having a value of $5,000.00 or more, and the Defendant, JOHN M. BROWN, then knew that the computer program and software manuals had been stolen, converted and taken by fraud."

Count II charged that Brown "knowingly possessed, concealed, stored, sold and disposed of computer programs, software and manuals, to wit: a computer program with source code PC–MOS/386 an exclusive product of The Software Link, Inc., (TSL), such items having a value of $5,000.00 or more and which had crossed a state or United States boundary after being stolen, and JOHN M. BROWN then knew the computer programs, software and manuals to have been stolen."

Count III was identical to Count II in all aspects other than the date of the offense and the deletion of the "sold and disposed of" language.

**6.** During this hearing, the court heard testimony from three witnesses, two for the prosecution and one for the defense. In addition, one exhibit was introduced by the government. This procedure is discussed in Part II, *infra*.

**7.** We note that the government did not object below to the district court's consideration of the evidence adduced at the hearing in ruling on the sufficiency of the indictment. In fact, not until the government's appellate Reply Brief was any

one exhibit was introduced in evidence by the government. The trial judge concluded the motion hearing by dismissing the indictment.

"An indictment is sufficient if it (1) contains the essential elements of the offense intended to be charged, (2) sufficiently apprises the accused of what he must be prepared to defend against, and (3) enables the accused to plead a judgment under the indictment as a bar to any subsequent prosecution for the same offense." *United States v. Kilpatrick*, 821 F.2d 1456, 1461 (10th Cir.1987), *aff'd sub nom. Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Arguing the facial sufficiency of the indictment, the government's Reply Brief on appeal says that the indictment here listed items specifically and physically related to the source code, which was physically possessed, stolen and transported to New Mexico. *See* note 5, *supra*. The government contends that it "is not for this court or the trial court to determine whether the facts support a conviction at this juncture." This is for the jury. Appellant's Reply Brief at 1–2.

This, however, is not the ordinary case arising on a motion to dismiss the indictment, as under Rule 12(b), Fed.R.Crim.P., for failure to state an offense. Here the parties *both* presented evidence and raised no objection to the judge's consideration of the facts. These circumstances are similar to those in *United States v. Risk*, 843 F.2d 1059 (7th Cir.1988). Risk was charged with failure to file Currency Transaction Reports for transactions involving more than $10,000, in violation of 31 U.S.C. §§ 5313 and 5322, 31 C.F.R. Part 103 and 18 U.S.C. § 2. Through discovery, the government gave Risk access to the documents presented to the grand jury that indicted him and Risk appended these documents to his mo-

tion to dismiss. The government's response to this motion conceded that the facts as presented by Risk were " 'essentially accurate[ ].' " [8] The facts developed showed that although Risk had been involved in transactions which in the aggregate totaled well over $10,000, no single transaction involved over $9,800.

In *Risk*, the district court held that the indictment was facially sufficient but that the facts developed could not establish a violation of the statute underlying the indictment. *Risk*, 843 F.2d at 1061. The government argued that the district court erred both procedurally and substantively in dismissing the case, exceeding its authority under Rule 12(b) by relying on incomplete facts. The Seventh Circuit stated that Rule 12(b) allows pretrial determination of any motion which can be resolved without trial of the general issue. Additionally, it was noted that Rule 12(e) allows the court to consider factual issues in determining a pretrial motion.[9] *Id.; see United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir.1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984).

 We find no procedural error here. Ordinarily the sufficiency of an indictment should be decided solely by the charges made in the indictment, without regard to the strength or weakness of the government's case. *Risk*, 843 F.2d at 1061. However, in circumstances like those in *Risk* or in the instant case, it is permissible and may be desirable where the facts are essentially undisputed, for the district court to examine the factual predicate for an indictment to determine whether the elements of the criminal charge can be shown sufficiently for a submissible case. In any event, here the government's procedural objection is untimely. "Now it is too late." *Risk*, 843 F.2d at 1061.

---

question raised as to the examination of the facts underlying the indictment.

**8.** In the instant case, the district court had before it the government's version of the facts through the testimony given by government witnesses and the statements made by government counsel at the evidentiary hearing.

**9.** Rule 12(e) provides:

A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

## III

■ We turn now to the charges of the indictment and to the evidentiary hearing on the motion to dismiss, including statements by counsel and testimony of witnesses, which developed essentially undisputed facts.

The indictment was stated in three counts. Count I alleged that Brown violated 18 U.S.C. § 2314, in February 1989 by transporting interstate, from Georgia to New Mexico, "computer programs, software and manuals, to wit: a computer program with source code PC–MOS/386 an exclusive product of The Software Link, Inc., (TSL), such items having a value of $5,000.00 or more." I R. Doc. 1 at 1. Count II alleged that Brown violated 18 U.S.C. § 2315 on July 28, 1989 because he "knowingly possessed, concealed, stored, sold and disposed of computer programs, software and manuals, to wit: a computer program with source code PC–MOS/386 ... which had crossed a state or United States boundary after being stolen." Id. at 1–2. Count III was virtually identical to Count II, except that the date was August 2, 1989 and the "sold and disposed of" language was deleted. Id. at 2.

The primary focus of the hearing on the motion to dismiss was on the applicability of Dowling to the case. Brown argued that Dowling applied because the government was not "complaining that Mr. Brown took a physical object from this company in Georgia and transported it in interstate commerce" but instead that he took a source code and transported it. II R. at 24.

The government attempted to distinguish this case from Dowling, arguing that

> [t]he major distinction in this case ... [is that the] source code took 15 years to develop by TSL. It is not something that Mr. Brown could have gone to TSL, talked to the engineers, talked to the computers, even if he is extremely literate and perhaps brilliant in the area of computer programming, left that area,

not taken anything physically that was not his, come to New Mexico and recreated it.

Id. at 27.

Brown claimed that the government could at most show that a copy of the program was made at TSL and was then transported in interstate commerce. Id. at 33. The court questioned this characterization of the government case since the indictment did not state that only a "copy" was involved. Id. In an attempt to clarify the government's position, the court asked the prosecutor to describe what its proof would show as to "how the program got to New Mexico" or, specifically, what Brown did "physically to acquire the program in Georgia." Id.

The government reply was that "TSL has it in their computers. He acquired that, and he could either have done it on a floppy disk or a tape or a hard disk and brought that with him to New Mexico." Id. at 35. The district judge asked: "Will the government prove that it was not [sic] the company's hard disk that was brought, physically?" The prosecuting attorney stated that she did "not believe the government can prove that TSL owned hard disk A and he stole hard disk A. I don't believe we can prove that." Id. at 36. The court then stated that since the government could not prove that, "we have to assume that a copy was made." Id. The prosecutor responded "[t]hat's correct," but argued that it made no difference because "he still knows that it is not something that he has a right to take." Id.

The government again attempted to distinguish Dowling by emphasizing that Dowling involved recordings made "off of something that's open to the public", while in the instant case the source code was "removed from things that the victim thought they had protected ...." Id. at 37. The court questioned as to "whether or not [something is] property depends on the method in which it's captured?" Id.[10] The

---

10. A pertinent excerpt from the transcript follows:

"THE COURT: So whether or not it's property depends on the method in which it's captured?

For example, this program that somebody devised, it's something intellectual.
MS. BURNETT: An idea.

court then directed both counsel to establish "a factual predicate ... to show ... what happened physically, and what physical objects were acted upon to bring the program to New Mexico." *Id.* at 39.

The government's first witness was Mr. Klossner, a special agent and local information systems administrator for the FBI in Albuquerque, who was present at the execution of the search warrant at Brown's apartment. *Id.* at 42. He stated that Mr. Roark, co-chairman of TSL and co-developer of PC–MOS/386, identified the source code from Brown's hard disk and bound paper printouts as being part of PC–MOS/386. *Id.* at 46. The judge attempted to determine the origin of this seized material by asking if the witness had "any information whatsoever insofar as the material that is contained in the five three-ring binders, that this was original material belonging to Software Link?" *Id.* at 51. Klossner replied that "it doesn't make sense to talk about original material." *Id.* Klossner further stated that he did not understand that Roark was indicating that the hard disk found in Brown's apartment, the physical object itself, was the property of TSL. *Id.* at 57. Klossner understood that Roark was saying that "the source code, the electronic signals on the hard disk, were the property of TSL, and the material, the source code as printed out in the binder were the property of TSL." *Id.* at 58.

The next government witness was FBI agent Gariay. He testified briefly about a tape recording, a transcript of which was offered into evidence. The recording was of a telephone conversation between Brown and Ben Brady. Brady was a cooperating witness for the government, who was to receive copies of the stolen source code.[11] Gariay testified that to his knowledge, Brown was discussing his appropriation of the source code itself. *Id.* at 65. When asked if these printouts could have been generated by Brown's own computer in Albuquerque, the witness stated that he had "no idea." *Id.* at 65.

The final witness was a defense witness, Peter Ives, who is an attorney specializing in intellectual property and computer law. Ives testified that "[t]he source code itself, under the copyright law, exists separate and apart from the tangible embodiment of that work." *Id.* at 68. Ives continued that "[t]he source code itself ... is essentially an intangible which then, for purposes of distribution and the like, would be put into some sort of tangible form as was discussed, disks, et cetera." *Id.* at 70. Ives concluded by agreeing with defense counsel's suggestion that the source code on a floppy disk was analogous to a song on a phono record. *Id.* at 72.

At this point the trial judge made his ruling "based upon the rationale in *Dowling.*" *Id.* at 72. The court found that the source code contained in the printouts in the binders, and which was contained in the hard disk, "is not the type of property which is contemplated ... within the language of the statute, goods, wares or mer-

---

THE COURT: An idea. Are you telling me that it depends on how you transfer that idea, or how or where you get—where you pick up that idea—I mean, where you steal that from?
MS. BURNETT: Well—
THE COURT: But is that what *Dowling* says?
MS. BURNETT: I think that what *Dowling* says is there is a difference between an intellectual property, which is this idea floating around and it's kind of intangible, and if you shrink it down and put it on paper. If it's on paper and what's on paper or some media is stolen, then that is 2314.
THE COURT: That's not what happened here.
MS. BURNETT: Well, it was put onto a disk. And there's no difference between a disk and a piece of paper. It was taken directly—this idea had been shrunk down and made into a program. Now it is in the banks of the computer

of TSL. And it is there to be used for the benefit of TSL, and it lives there. And Mr. Brown then physically takes a copy of that out and—"
II R. at 37–38.

11. A pertinent portion of the conversation follows:
> Brown: I've got five, three ring binders that's full of printouts.
> Brady: Right that include PC MOS 3.0.
> Brown: 3.1
> Brady: 3.1?
> Brown: Yes.
> Brady: When did you get that?
> Brown: When I was out there.
Addendum to Appellant's Brief at 2.

chandise." *Id.* at 73. Furthermore, the court noted that it took "into consideration that which *Dowling* discusses, and that is[,] that a criminal statute must be construed strictly." *Id.* at 73. A brief written order followed this ruling, giving no further reasons, but stating that the indictment was "dismissed in its entirety." I R. Doc. 21.

## IV

In *Dowling*, the defendant was convicted under § 2314 of the National Stolen Property Act following his distribution of "bootleg" phonograph recordings of Elvis Presley vocalizations, the copyrights for which were owned by other persons.[12] The Court reasoned that crimes involving copyright violations could be dealt with through a variety of means, chiefly civil, and that it was not Congress' intention that the National Stolen Property Act function as a criminalization of copyright infringement. *Id.* at 216–18, 105 S.Ct. at 3132–34. The Court noted that the courts have never required that the items stolen and transported remain in entirely unaltered form. The Court emphasized, however, that:

> [T]hese cases and others prosecuted under § 2314 have always involved physical "goods, wares, [or] merchandise" that have themselves been "stolen, converted or taken by fraud." This basic element comports with the common-sense meaning of the statutory language: by requiring that the "goods, wares, [or] merchandise" be "the same" as those "stolen, converted or taken by fraud," the provision seems clearly to contemplate a physical identity between the items unlawfully obtained and those

eventually transported, and hence some prior physical taking of the subject goods.

473 U.S. at 216, 105 S.Ct. at 3132 (emphasis added). This essential ingredient of the statute—the involvement of physical "goods, wares, [or] merchandise" that were themselves "stolen, converted or taken by fraud"—was missing in *Dowling* and is likewise missing here.

The government argues that the case before us is distinguishable from *Dowling* primarily because the recordings in *Dowling* were taken off of the radio. Members of the public are allowed to listen to these recordings when broadcast and to make a copy for their own personal use, but not to make numerous copies and sell them commercially, as Dowling did. *See Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). *Dowling* involves a bare copyright violation, since Dowling merely used recordings which he possessed legally, in a manner which went beyond what was permissible. In the instant case, however, the government says that an actual taking occurred because the "source code" which was found in Brown's apartment was never released to anyone outside TSL. The program, therefore, had to have been originally physically taken from TSL through illicit means.[13]

As noted, *Dowling* holds that § 2314 applies only to physical "goods, wares or merchandise." Purely intellectual property is not within this category. It can be represented physically, such as through writing on a page, but the underlying, intellectual property itself, remains intangible.[14] It is

---

12. "A 'bootleg' phonorecord is one which contains an unauthorized copy of a commercially unreleased performance." *Dowling,* 473 U.S. at 209 n. 2, 105 S.Ct. at 3129 n. 2.

13. *See* II R. at 37–38.

14. *Dowling* cites with approval cases which involved the application of § 2314 for theft of intellectual property, *in conjunction with* theft of tangible media. *United States v. Seagraves,* 265 F.2d 876 (3d Cir.1959) (conspiracy to violate § 2314); *United States v. Greenwald,* 479 F.2d 320 (6th Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct.

154, 38 L.Ed.2d 104 (1973). The Court noted that these cases "have always involved physical 'goods, wares, or merchandise' that have themselves been 'stolen, converted or taken by fraud'.... [T]he provision seems clearly to contemplate a physical identity between the items unlawfully obtained and those eventually transported, and hence some prior physical taking of the subject goods." *Id.,* 473 U.S. at 216, 105 S.Ct. at 3132.

Cases such as *Seagraves* and *Greenwald,* do not apply § 2314 to a bare intangible, but merely allow an intangible component of a tangible item, such as a chemical formula written on a

true that the intellectual property involved in the instant case was more nearly "stolen, converted or taken by fraud" in the sense that it was at no time freely presented to the public as had been the recordings in *Dowling*.[15] In fact, the government says here that Brown himself, although a programmer at TSL, did not have authorized access to the PC–MOS/386 source code file. II R. at 58. This point, however, is not dispositive of the critical issue under *Dowling*. Here we agree that the property, PC–MOS/386, does not meet the requirement of §§ 2314 and 2315 respecting "goods, wares, or merchandise." We hold that the computer program itself is an intangible intellectual property, and as such, it alone cannot constitute goods, wares, merchandise, securities or moneys which have been stolen, converted or taken within the meaning of §§ 2314 or 2315.

The recent case of *United States v. Riggs*, 739 F.Supp. 414 (N.D.Ill.1990), was cited by the government as supplemental authority for the proposition that source codes can be described as goods, wares, or merchandise. Mr. Riggs was convicted under 18 U.S.C. § 2314 for the theft of an electronic text file owned by Bell South. A text file is very similar to a source code file in most respects. Riggs stole the text file by accessing the Bell South computer and transferring the text file over phone lines to his own computer. No physical item was taken from Bell South.

The district court reasoned that "if the information in Bell South's E911 text file had been affixed to a floppy disk, or printed out on a computer printer, then [defendant's] transfer of that information across state lines would clearly constitute the transfer of 'goods, wares, or merchandise' within the meaning of § 2314." *Id.* The district court found "no reason to hold differently simply because [defendant] stored the information inside computers instead of printing it out on paper. In either case, the information is in a transferrable, accessible, even salable form." The court further reasoned that "reading a tangibility requirement into the definition of 'goods, wares, or merchandise' might unduly restrict the scope of § 2314, especially in this modern technological age." The court found that "[t]he accessability of the information in readable form from a particular storage place also makes the information tangible, transferable, salable and, in [the district] court's opinion, brings it within the definition of 'goods, wares, or merchandise' under § 2314." *Id.* at 422.

We disagree. We feel that the *Riggs* interpretation of the statute is in error in light of the Supreme Court's focus on "physical 'goods, wares [or] merchandise' that have themselves been 'stolen, converted or taken by fraud,'" 473 U.S. at 216, 105 S.Ct. at 3132. The element of physical

---

stolen piece of paper, to contribute to the value of the item in order to satisfy the $5,000 statutory minimum for § 2314. Nevertheless, for § 2314 to apply there must be some tangible item taken, however insignificant or valueless it may be, absent the intangible component. *See also United States v. Stegora*, 849 F.2d 291, 292 (8th Cir.1988) (where sample of a synthetic casting material was stolen, using research, development, and manufacturing costs along with value of item "in the thieves market" in order to meet the $5000 valuation).

In the instant case, the testimony presented by the prosecution, as well as statements made by the prosecutor, indicated that there was no evidence which would tend to prove that defendant Brown was involved in the physical theft or transportation of physical property belonging to TSL. II R. at 34–36, 50–52, 64–65.

**15.** The situation before us is similar to a hypothetical presented in *Dowling*. The Court describes a case in which "The Nation, a weekly

magazine of political commentary, had infringed former President Ford's copyright in the unpublished manuscript of his memoirs by verbatim excerpting of some 300 words from the work." *Dowling*, 473 U.S. at 226, 105 S.Ct. at 3137. The Court went on to say that "we would pause, in the absence of any explicit indication of congressional intention, to bring such conduct within the purview of a criminal statute, making available serious penalties for the interstate transportation of goods 'stolen, converted or taken by fraud.'" *Id.*

In this hypothetical, as in the case before us, the intellectual property had not been released to the public and much of the value of the property was due to the unrevealed nature of such property. The release of select portions of either the book or the computer code could severely impact the market for either item. Nevertheless, we feel that in this case, as in the Court's hypothetical, the conduct complained of is not within the purview of § 2314.

"goods, wares, or merchandise" in §§ 2314 and 2315 is critical. The limitation which this places on the reach of the National Stolen Property Act is imposed by the statute itself, and must be observed. *See Dowling* at 218, 226, 105 S.Ct. at 3133, 3137.

"Federal crimes, of course, 'are solely creatures of statute ...,'" *Dowling*, 473 U.S. at 213, 105 S.Ct. at 3131 (citations omitted). The language of the statutes involved here does not support the government's broad-ranging interpretation of §§ 2314 and 2315, and even if this were less apparent, the ambiguity concerning the ambit of the criminal statutes should be resolved in favor of lenity. *See Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). Since the government could not establish that the defendant had transported, transmitted or transferred in interstate commerce (§ 2314), or received, possessed, concealed, stored, bartered, sold or disposed of (§ 2315) any physical "goods, wares or merchandise ...," the indictment was properly dismissed.

AFFIRMED.